## Commonwealth v. Williams

*James F. Marx,* district attorney, *David Sharman, Jr.,* assistant district attorney, *Allan K. Grim,* and *Stevens & Lee,* for Commonwealth.

*Darlington Hoopes,* for defendant.

MAYS, J., July 28, 1941.—The indictment charges that defendant "did unlawfully write, print, publish, and exhibit concerning the said Max Beckerman a certain malicious and defamatory libel in words and figures as follows:

" 'Do you know that Beckerman is being investigated by the U. S. Government because he has not abided by

the Wage-Hour Law which requires him to pay over-time pay?  Do you know that besides this he is also being prosecuted in Berks Court for not paying over-time wages?

" 'Do you know how to figure your overtime rate of pay?

" 'Here is how to figure your pay for overtime.  If you have earned $16 in 40 hours, then you must be paid at the rate of 40¢ each hour plus half time for each additional hour that you work.  Or if you have earned $20 per 40 hours then your hourly rate is 50¢ per hour and your overtime rating then is 75¢ per hour and not 35¢ plus 17½¢ as Beckerman is paying!  Don't let yourself be cheated!

" 'Many Beckerman workers have already reported that they have not been getting their full time over-time pay and we have reported their cases to the Gov-ernment, and they will get their money.  If you do not get your correct pay notify us and we will willingly see to it that you will get what rightfully belongs to you, etc.,'—thereby tending to blacken the reputation of the said Max Beckerman and exposing him, the said Max Beckerman, to public hatred, contempt, and ridi-cule, contrary to the form of the Act of the General Assembly in such case made and provided, and against the peace and dignity of the Commonwealth of Penn-sylvania."

To this indictment defendant filed a motion to quash, alleging:

"(a) The matter set forth in the indictment and alleged to have been published by defendant is not a malicious or defamatory libel, and does not tend to blacken the reputation of the prosecutor, or to expose him to public hatred, contempt or ridicule, because the conduct alleged to have been charged against the prose-cutor is not infamous or bad in itself, but is wrong only because made so by statute, does not involve infamy or moral turpitude, and does not degrade or disgrace

the prosecutor, and the punishment, therefore, is not infamous.

"(b) The matter set forth in the indictment and alleged to have been published by defendant was proper for public investigation or information, and therefore, under article I, sec. 7, of the Constitution of Pennsylvania, no conviction can be had."

Because of the disposition made of this matter and the nature of the proceeding, we shall not at this time discuss in detail all of the matters that may be involved at and in the trial of the cause. It is sufficient to say that an examination of the statute of this State (see 18 PS §4412) will at once impress the reader with the fact that it is very strict in its terms and makes libelous the writing, printing, publishing, or exhibiting of any malicious or defamatory libel tending to blacken the reputation of one who is alive, thereby exposing him to public hatred, contempt, or ridicule.

Anyone who violates the Fair Labor Standards Act of June 25, 1938 (29 U. S. C. sec. 201 et seq.), 52 Stat. at L. 1060, is subject to punishment either by fine or imprisonment or both.

The statement quoted in the indictment in saying that this man is prosecuted necessarily implies that he has breached one of the laws of this country. In criminal libel ". . . it is not necessary that the imputation should amount to a charge of crime or an indictable offense, it being sufficient if the defamatory words are of such nature that they tend to disgrace and degrade the person libeled, or hold him up to public hatred, contempt, or ridicule, or cause that person to be shunned or avoided": 37 C. J. 138, §633.

As a matter of law we should not conclude that what was here published is not malicious, and does not tend to expose Beckerman to ridicule, contempt, hatred, or degradation of character. Years ago what this man Beckerman is alleged to have done might not have held

him up to public hatred, contempt, or ridicule. Today, however, it may be different.

It is the policy of the law, in the light of our economic conditions and social trends, to punish persons who do not comply with fair labor standards. If this man did comply, and someone charges him with evading the law, under such circumstances he certainly should have the right to have a jury determine whether or not the author of the alleged libel acted maliciously and without foundation and subjected him to public ridicule or contempt.

Under the circumstances of this case, we believe it is for a jury and not for the court to determine whether this alleged publication is or is not libelous.

In Commonwealth v. Murphy et al., 8 Pa. C. C. 399, Endlich, J., said (pp. 406-07) :

"A very different question arises as to whether the court or the jury is to decide the character of the publication as libelous or not libelous? That, under the Constitution, belongs to the jury, as it should. . . . Again, the meaning of words and phrases change. A word that was opprobrious a generation ago may have no such meaning at all to-day. It occurs to me that the word 'villain," by which we describe a man very far down in the moral scale, was centuries ago used to denote a very respectable class of the community, without any shade of reproach. Now, if the law were to undertake to fix upon each word and phrase a meaning that should always be the same—should undertake to say whether such a word should be regarded for all time as libelous, it would fall behind the age and be unjust. It would be the means of oppression instead of the means of justice in cases of libel. Therefore, the question whether or not a publication is libelous is for the jury, and not for the court."

We have read and carefully considered the authorities cited by defendant and the authorities generally, and find that they have no bearing on the matter here

under consideration, for the reason that, in determining whether particular words are actionable per se, the same rule does not apply to libel as to slander.

"There is a recognized distinction between words spoken and those written, in respect to their constituting a ground of action per se; and, in determining whether particular words are actionable per se, the same rules do not apply to libel as to slander. The law of libel is of wider extent than that of slander; or, stated conversely, the law of slander is much narrower in scope and operation than the law of libel. The presumption that words are defamatory arises much more readily in cases of libel than in cases of slander. While whatever charge will sustain a suit for slander when the words are merely spoken will sustain a suit for libel if they are written or printed and published, defamatory matter printed and published may be per se actionable while the same matter orally published would not be so": 36 C. J. 1152, §19.

In Luckock v. Daily News Publishing Co., 74 Pa. Superior Ct. 429, Head, J., said (pp. 430-31) :

"In Pittock and Mills v. O'Neill, 63 Pa. 253, Mr. Justice Sharswood thus defines a libel: 'A libel may be defined to be any malicious publication, written, printed or painted, which, by word or signs, tends to expose a man to ridicule, contempt, hatred or degradation of character.' From an examination of this clear definition it will appear that it is just as offensive in the eyes of the law to attempt to subject a man to public ridicule or contempt as it is to charge him with a crime which would result in the degradation of his character. Naturally, and quite properly, this is true. There are no weapons more effective for the destruction of the peace of mind and happiness of a citizen than public ridicule or contempt."

And now, to wit, July 28, 1941, the motion to quash is overruled.